**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4598 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE COUNTY OF COOK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Anthony Harris, a pretrial detainee, contracted an eye disease while incarcerated at the Cook County Jail. His eyes became inflamed one morning, and he had trouble seeing. The jail's medical facility sent him to a local hospital, which prescribed medication. It worked. The inflammation healed, and he regained normal vision.

Two years later, his condition flared up again. The jail sent Harris to a special medical unit for detainees receiving medical treatment. According to Harris, the special medical unit was filthy, especially the air. The inadequate ventilation allegedly worsened his medical condition.

Harris ultimately sued two correctional officers, the Sheriff, and Cook County, alleging inadequate medical care and unconstitutional conditions of confinement. After discovery, Defendants moved for summary judgment.

For the reasons that follow, the Court grants Defendants' motion for summary judgment on the claims against the officers in their individual capacities. For now, the Court defers its ruling on the *Monell* claim. Defendants raised an argument for the first time in their reply brief, so under Rule 56(f)(2), the Court grants Harris an opportunity to respond.

**Prefatory Note**

Before diving into the facts, it is important to take care of a few housekeeping chores.

All too often, the parties cited their own pleadings as support for facts in their statements of fact. Harris, in particular, was a repeat offender. Time and again, Harris floated a fact in his Rule 56.1 statement of facts, and then supported it in whole or in part with a citation to his own complaint.

That won't do. Allegations in a complaint are enough to launch a case at the starting line. But summary judgment is fundamentally different. Summary judgment is the time for facts, not allegations. Summary judgment is the time for evidence. And a complaint is not evidence. A complaint is an allegation. Think of it like an accusation – a party cannot establish that "X" actually happened by offering evidence that a person was *accused* of "X."

A plaintiff cannot support a fact by citing his or her own complaint, because a complaint is not evidence. As a result, the Court strikes all statements of fact that rest, in whole or in part, on allegations in the pleadings. *See, e.g.*, Pl.'s Statement of Additional Facts, at ¶¶ 1, 4, 10, 12, 13, 16, 17, 19, 20, 21, 22 (Dckt. No. 59-1) (citations to the complaint by the Plaintiff); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 1, 6, 20 (Dckt. No. 61-1) (citations to the answer by the Defendants).[1]

On a related note, at times, the parties summarized the allegations in the complaint in their statements of fact. That is, they made statements like "Harris alleges 'X'" – without

---

[1] Defendants also cited the complaint to support some of their facts, but that's different. *See* Defs.' Statement of Facts, at ¶¶ 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 15, 16, 17 (Dckt. No. 52-1). A pleading filed by an opposing party is a statement of a party opponent. A pleading filed by the other side is fair game because it is an admission.

offering evidence about whether X actually happened. *See, e.g.*, Defs.' Statement of Facts, at ¶¶ 2, 10, 16, 17 (Dckt. No. 52-1).

It is not particularly helpful for the parties to offer, as a statement of fact, a summary of the *allegations*. This Court knows what Harris alleged in the complaint, because this Court has read the complaint. Summary judgment is supposed to be about the facts, not a party's allegations about the facts.

Consider the following example. The cleanliness of the Residential Treatment Unit ("RTU"), a special medical unit for detainees, plays an important role in the background of the case. In his complaint, Harris alleged that the RTU was filthy. He alleged that there was urine on the floor, and that the facility lacked adequate janitorial services, cleaning supplies, clean bedding, and ventilation systems. *See* Am. Cplt. at ¶ 18 (Dckt. No. 18).

But the parties don't offer much evidence about the cleanliness of the RTU. Instead, the statements of fact summarized Harris's allegations in the complaint. "Plaintiff *alleges* that the Facility's ventilation system is rarely clean and is visibly filthy." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 16 (Dckt. No. 59-1) (emphasis added) (citing paragraph 18 of the amended complaint).

In his statement of facts, Harris stated that he "has continued to live in filthy, unsanitary conditions, including urine on the floor, a lack of janitorial services and cleaning supplies, the cleaning of food utensils in showers, and a lack of clean bedding." *See* Pl.'s Statement of Additional Facts, at ¶ 12 (Dckt. No. 59-1). Harris cited paragraph 18 of the amended complaint as support. The only morsel of testimony was a snippet from his deposition about dirty bedding. *Id.* (citing page 45 of his deposition); *see also* Harris Dep., at 45:2-12 (Dckt. No. 52-5).

Harris offers *allegations* about cleanliness, not *evidence* about cleanliness. A complaint is not evidence (unless it is offered against the plaintiff as an admission of a party opponent, which isn't the case here). A complaint is an allegation, and an allegation has no evidentiary value. For whatever reason, the parties repeated allegations about the cleanliness of the facility, without offering much evidence. The statements of fact left Evidence Land, and reentered Allegation Land.

One final observation. The statements of fact from the parties left much to be desired. They did not tell a particularly coherent story. The loose language frustrated the Court's attempt to pin down what happened, and when. And there were gaps in the narrative, too. So, this Court did its best to piece together the story, but if the reader is left wanting more, the reader is not wrong (and not alone).

## Background

In March 2016, Anthony Harris arrived as a pretrial detainee at the Cook County Department of Corrections. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 59-1). On May 11, 2016, Harris woke up with blurred vision, nausea, light sensitivity, and eye pain. *Id.* at ¶ 3.

The parties disagree about what caused the eye problems in the first place. *See* Pl.'s Statement of Additional Facts, at ¶¶ 1–5 (Dckt. No. 59-1); Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶¶ 1–3, 5 (Dckt. No. 61-1). That issue is neither here nor there. The case is about the treatment for his eye condition, not how he got the condition in the first place. *See* Am. Cplt., at ¶¶ 21–35 (Dckt. No. 18).

Harris sought medical assistance, and a nurse at the jail referred him to the nearby Stroger Hospital. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 4 (Dckt. No. 59-1). Once there, the

medical staffed diagnosed Harris with panuveitis, a chronic inflammatory disease that causes all major parts of the eye to suffer from inflammation. *Id.*

Panuveitis is a serious condition. If left untreated, it could lead to permanent vision loss, retinal detachment, optic nerve damage, and cataracts. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 61-1).

The hospital treated Harris for his condition. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 5 (Dckt. No. 59-1). He returned to the jail at some point, but the parties don't reveal when. *Id.*

A few months later (in 2016), his symptoms returned, and he went back to the hospital. *Id.* at ¶¶ 5–6. When he returned, the jail placed him in the medical unit. *Id.* at ¶ 6. He stayed there for less than 48 hours.[2] *Id.*

The statements of fact include some information about the treatment that Harris has received, but the parties aren't clear about the timing. They agree that "[a]fter his diagnosis and initial treatment, Mr. Harris *has been regularly seen* by doctors and he has been prescribed a variety of eye drops, oral medications, and eye injections." *Id.* at ¶ 7 (emphasis added). Harris "has received" eye and blood tests to rule out any non-environmental triggers for the disease, too. *Id.* at ¶ 8.

_____

[2] The parties do not paint a clear picture of when Harris went to the hospital for his eye, how many times he went to the hospital, how long he was in the facility's medical unit, or whether he was in the medical unit more than once. Defendants' statement of facts (which Harris does not dispute) simply states: "[a]fter his second hospitalization, Mr. Harris was housed in the facility medical unit for less than 48 hours." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 6 (Dckt. No. 59-1). In Harris's statement of facts (which Defendants don't dispute), Harris explains that his symptoms flared up again in November 2016, requiring a visit to Stroger Hospital and housing in the facility medical unit "for less than 24 hours." Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 10 (Dckt. No. 61-1). It isn't obvious whether they are the same hospital visits (Defendants don't provide any dates). Harris's bed assignment sheet lists multiple visits to the hospital in May, July, and November 2016. *See* Harris Bed Assignment, at 2 (Dckt. No. 59-2). The exact timing of events doesn't impact the Court's holding. If the reader wanted more precision, so did the Court.

In a similar vein, the parties agree that Harris "has received ongoing medical appointments and medications for his panuveitis." *Id.* at ¶ 9. Harris has had "multiple medical appointments." *Id.* at ¶ 18. Harris also saw an ophthalmologist, too.[3] *Id.* at ¶ 19.

The open-ended phraseology suggests open-ended medical care. The record shows that Harris received medical care after the diagnosis in 2016. And there is nothing in the record suggesting that the medical care stopped. Maybe Harris "has been regularly seen by doctors" and "has received" tests ever since he landed in the hospital in 2016, including the present day. *Id.* at ¶ 7. The punchline is that, as the Court reads it, Harris apparently has received medical treatment ever since the diagnosis in 2016.

In 2016, Harris filed four grievances about his conditions of confinement and his eye disease. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 61-1); Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 12 (Dckt. No. 59-1).

The first grievance mentioned the unsanitary living conditions. On June 10, 2016, Harris filed a grievance seeking compensation for "punitive damages and [unsanitary] living conditions." *See* 6/10/16 Grievance (Dckt. No. 52-3, at 2 of 7). He did not describe his living facilities in further detail. He also didn't mention the need for fresh air, ventilation, or cleaning supplies. *Id.*

Within two weeks, Harris filed two more grievances. He claimed that the jail had failed to provide adequate medical treatment for his eye. *See* 6/19/16 Grievance (Dckt. No. 59-3, at 4 of 14); 6/22/16 Grievance (Dckt. No. 59-3, at 7 of 14).

---

[3] Harris says that he saw an ophthalmologist (singular), "but only in the early part of his diagnosis." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 19 (Dckt. No. 59-1) (citing Harris Dep., at 62:12-15, 82:9-12 (Dckt. No. 52-5)). In fact, Harris cites a section of his deposition where he explains that *two* ophthalmologists treated him. *See* Harris Dep., at 82:9-12. The difference isn't particularly important, but it establishes that he was treated by *specialists*, not just one specialist at one time.

6

On July 2, 2016, Harris filed a fourth grievance, complaining once again about his living conditions. He asserted that his living conditions caused his eye disease, and he blamed "mold, dirt, & filth" as well as "high levels of paint chemicals." *See* 7/2/16 Grievance (Dckt. No. 52-4, at 2–3 of 4).

The parties don't pin down when Harris's health started to improve. At deposition, Harris testified that the medication reduced his swelling, and that he could see again "[m]aybe like a couple of months after the incident" in March 2016. *See* Harris Dep., at 24:19-23 (Dckt. No. 52-5).

The parties then jump ahead to 2018, so the Court will follow suit.

Beginning in May 2018, Harris spent close to two years at the Residential Treatment Unit (again, "RTU"), a special medical unit for detainees receiving medical treatment. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15 (Dckt. No. 59-1); Harris Bed Assignment, at 2 (Dckt. No. 59-2). It is unclear why Harris was in the RTU in 2018. Maybe his eye condition flared up, or maybe he suffered from some other condition. The parties don't fill in the details. It is also uncertain whether Harris is still in the RTU. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 15.

The facility placed limits on how often inmates could go outside. Inmates would go outside twice a week, for about an hour. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 14 (Dckt. No. 61-1). But they could receive less time outside, depending on the weather. *Id.* at ¶ 15.[4]

---

[4] Again, in their statement of facts on this issue, Defendants summarized the allegations of the complaint. "Plaintiff *alleges* that, during the warmer months, the detainees are provided with time outside and exposure to fresh air only two to three days per month." *See* Defs.' Statement of Facts, at ¶ 17 (Dckt. No. 52-1) (emphasis added). There is no need to summarize the allegations of a complaint in a statement of facts. The complaint is in the record, and the allegations of the complaint aren't evidence. What matters is facts – backed by evidence – not allegations.

In July 2019, Harris later filed suit, on a *pro se* basis, under 42 U.S.C. § 1983, claiming that the jail staff failed to respond to his requests for housing that would not aggravate his disease. *See* Cplt. (Dckt. No. 1). Judge Feinerman (this Court's predecessor, before reassignment) appointed him counsel.[5] *See* 9/16/2019 Order (Dckt. No. 9). The case was then reassigned to this Court.

Harris then filed an amended complaint against Correctional Lieutenant Damita Delitza, Correctional Lieutenant Darnice Wiggins, Unnamed Correctional Officers of the Cook County Department of Corrections, Sheriff Thomas Dart, and Cook County. *See* Am. Cplt. (Dckt. No. 18).

Harris claims that Defendants' response to his serious medical need was objectively unreasonable and subjected him to substandard conditions of confinement. He seeks injunctive relief in the form of increased fresh air and sanitary holding conditions, along with compensatory damages. *Id.*

After months of discovery, Defendants moved for summary judgment. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 52).

The parties paint different pictures of Harris's current health. Defendants argue that Harris no longer suffers from inflammation, and has regained normal vision. *See* Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 52-1). Harris agrees that his inflammation "has

---

[5] Harris is a frequent filer in this courthouse. As best as the Court can tell, Harris has filed at least eight federal lawsuits in this District. *See Harris v. Hypatia, et al.*, 18-cv-2016 (N.D. Ill. 2019); *Harris v. Chicago Police Department*, 16-cv-5025 (N.D. Ill. 2017); *Harris v. Doe*, 14-cv-9090 (N.D. Ill. 2015); *Harris v. Martinez, et al.*, 10-cv-6198 (N.D. Ill. 2010). This Court has personally had four cases with Harris, including this one. *See Harris v. Ealey*, 19-cv-2210 (N.D. Ill.) (closed on 12/8/21); *Harris v. Avila*, No. 19-cv-4599 (N.D. Ill. 2021) (closed on 11/2/21); *Harris v. The County of Cook, et al.*, No. 19-cv-4598 (N.D. Ill.); *Harris v. Khan, et al.*, No. 19-cv-5138 (N.D. Ill. 2020) (closed on 3/5/20). In another case, this Court recently entered summary judgment against Harris for picking a fight with a guard (who was 6' 8"). *See Harris v. Ealey*, 2021 WL 5823513 (N.D. Ill. 2021).

improved," but he contends that he "will never fully heal." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 59-1).

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Harris advances two claims under 42 U.S.C. § 1983. First, he brings a medical-care claim against Delitz, Wiggins, and Unnamed Correctional Officers of the Cook County

Department of Corrections.[6] *See* Am. Cplt., at ¶¶ 21–29 (Dckt. No. 18). Second, he brings a conditions-of-confinement claim against Sheriff Dart and Cook County. *Id.* at ¶¶ 30–35.

Harris sued the individual defendants in both their individual and official capacities. *See* Am. Cplt., at 1 (Dckt. No. 18). "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985). "Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* (citations omitted) (quoting *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 n.55 (1978)). An official capacity claim "is *not* a suit against the official personally, for the real party in interest is the entity." *Id.* (emphasis in original).

But exhaustion comes first.

## I.  Exhaustion

Ordinarily, exhaustion is a "threshold issue[]" that a district court should decide before the merits. *See Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). "[T]he statutory goal of sparing federal courts the burden of prisoner litigation until and unless the prisoner has exhausted his administrative remedies" is best served by investigating exhaustion at the outset, rather than waiting until summary judgment. *See Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008).

Exhaustion under the PLRA is an affirmative defense. So Defendants have the burden to demonstrate that Harris failed to exhaust his administrative remedies. *See Turley v. Rednour*,

---

[6] The deadline to serve unnamed defendants has long since passed. *See* Fed. R. Civ. P. 4(m). So the unnamed defendants are dismissed. And any claim against them would fail for the same reason as the claim against the named officers.

729 F.3d 645, 650 (7th Cir. 2013); *Jones v. Bock*, 549 U.S. 199, 212 (2007). Exhaustion, like any other affirmative defense, can be waived or forfeited. "Defendants may waive or forfeit reliance on § 1997e(a), just as they may waive or forfeit the benefit of a statute of limitations." *Perez v. Wis. Dep't of Corr.*, 182 F.3d 532, 536 (7th Cir. 1999).

Here, Defendants raised exhaustion with their substantive arguments for summary judgment. The Seventh Circuit has explained that it is not a "best practice[]" to raise an exhaustion issue for the first time at the summary judgment stage. Exhaustion is meant to weed out cases up front, rather than waiting until discovery is finished. *See Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015).

A bigger problem (by a long shot) is the failure to meet this Court's deadline (by a long shot). Harris filed his amended complaint in January 2020. *See* Am. Cplt. (Dckt. No. 18). In May 2020, this Court set a deadline, directing that "[a]ny motion based on a failure to exhaust must be filed by July 15, 2020." *See* 5/20/20 Order (Dckt. No. 34). The Court's deadline was not immovable, and the Court recognized that if the July date was "impracticable" because of "the unique challenges" of the current public-health crisis, then Defendants could file a motion to extend the date. *Id.* "But the point is that an exhaustion defense needs to be teed up sooner rather than later." *Id.*; *see Pavey*, 544 F.3d at 742 ("We emphasize that in the ordinary case discovery with respect to the merits should be deferred until the issue of exhaustion is resolved.").

Defendants didn't request an extension of the Court's deadline. Defendants also didn't file any motion about exhaustion until they filed their motion for summary judgment in June 2021. *See* Defs.' Mtn. for Summ. J. (Dckt. No. 52). That's 11 months late.

11

"Scheduling orders and court-imposed deadlines matter." *Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020). As this Court has already explained, "[t]he parties should assume that the Court's deadline are, in fact, deadlines, unless and until the Court changes them." *See* 5/20/21 Order (Dckt. No. 51). The Court "could fill page after page with citations to cases brought by prisoners that were dismissed for failing to follow court rules or deadlines." *See Bowman*, 962 F.3d at 998. So "[i]f prisoners are held to that standard, their opponents should be too." *Id.* What's good for the goose is good for the gander (and what's bad for the goose is bad for the gander).

Defendants make no attempt to show that "excusable neglect" applies to their delay in filing an exhaustion-based motion. They provide no explanation *at all* for their delay. *See* Fed. R. Civ. P. 6(b)(1)(B).

Defendants did include exhaustion as an affirmative defense in their answer to the complaint in June 2020. *See* Defs.' Answer, at ¶ 4 (Dckt No. 36, at 13 of 14). But that's insufficient, on its own, to withstand forfeiture – especially because the Defendants did nothing to press the issue during discovery and the Court was already aware of the exhaustion affirmative defense when it set the July 15, 2020 deadline. *See Watson v. Owikoti*, 2017 WL 4180339, at *3 (N.D. Ill. 2017) (concluding that defendants forfeited their exhaustion defense "by sitting on their hands for so long" because "[t]hey essentially did nothing other than plead the defense in their answer" before bringing the defense in their summary judgment motion); 5/18/20 Joint Status Report, at 2 (Dckt. No. 33) (listing exhaustion as an affirmative defense); 5/20/20 Order (Dckt. No. 34) (instructing Defendants to file an exhaustion-based motion by July 2020).

Defendants have forfeited their exhaustion defense by raising the issue long after the Court's deadline, with no explanation for the delay and no excuse for their neglect. *See*

12

*Bowman*, 962 F.3d at 998; *Ricci v. Salzman*, 976 F.3d 768, 771 n.2 (7th Cir. 2020) (explaining that "forfeiture occurs when a party fails to make an argument because of accident or neglect," whereas waiver "is a deliberate decision not to present a ground for relief that might be available in the law") (cleaned up).

## II.     Individual Capacity Claims – Inadequate Medical Care

Harris claims that Officers Delitz, Wiggins, and Unnamed Correctional Officers of the Cook County Department of Corrections failed to respond to his serious medical need.

Harris sued all Defendants in their individual and official capacities. But he never explains the distinction in his complaint, and he doesn't separate his claims based on individual or official capacity. *See* Am. Cplt., at ¶¶ 21–35 (Dckt. No. 18). So, this section of the Opinion will cover the claims against the Defendants in their individual capacities, and the next section will address the official capacity claims.[7]

The Fourteenth Amendment governs medical care claims by pretrial detainees. *See Miranda v. County of Lake*, 900 F.3d 335, 350 (7th Cir. 2018). "After *Miranda*, . . . the controlling inquiry for assessing a due process challenge to a pretrial detainee's medical care proceeds in two steps." *See McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). That two-step process assumes that the claim is about an objectively serious medical condition (which could be considered a third step). So it is more of a triple jump than a two-step.

---

[7]  The caption of the amended complaint purports to bring a claim against all Defendants, including Sheriff Dart, in their individual and official capacities. *See* Am. Cplt. (Dckt. No. 18). The opening paragraph similarly alleges that Harris is suing all Defendants "in their individual and official capacities." *Id.* But Harris appears to have abandoned any and all individual capacity claims against Sheriff Dart. In his brief, Harris explains that he is "seeking damages from Defendant Dart in his official capacity as Cook County Sheriff." *See* Pl.'s Mem., at 11 (Dckt. No. 59). And more importantly, there is no evidence in the record that could support a claim against Sheriff Dart in his individual capacity for anything. There is no evidence of his personal involvement. So, to the extent Harris purported to sue Sheriff Dart in his individual capacity, the Court grants summary judgment to Sheriff Dart on all such claims.

The parties agree that Harris's panuveitis condition was objectively serious, or at least they don't contest the issue. Only the other two steps are at issue.

The first step "focuses on the intentionality of the individual defendant's conduct," and asks whether defendants "'acted purposefully, knowingly, or perhaps even recklessly when they considered the consequences of their handling of [plaintiff's] case.'" *Id.* (quoting *Miranda*, 900 F.3d at 353). A "showing of negligence or even gross negligence will not suffice." *Id.* Instead, a defendant's conduct must be "'something akin to reckless disregard.'" *See Miranda*, 900 F.3d at 353 (quoting *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)); *Pittman by & through Hamilton v. County of Madison*, 970 F.3d 823, 827–28 (7th Cir. 2020).

The second step is an objective analysis of the reasonableness of the defendant's actions. "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively – without regard to any subjective belief held by the individual – whether the response was reasonable." *See McCann*, 909 F.3d at 886. In applying its objective analysis, the Court must look to the overall course of treatment, considering whether "medical staff diligently attended" to the plaintiff's needs and whether the plaintiff was "examined . . . regularly and promptly to address his complaints." *See Williams v. Ortiz*, 937 F.3d 936, 943 (7th Cir. 2019).

This case suffers from seismic evidentiary gaps. There is no evidence that a doctor prescribed more fresh air and cleaner cells for Harris. There is no evidence that Officer Delitz and Officer Wiggins knew about any such prescription, if any. There is no evidence that they knew that he had a medical condition. And there is no evidence that they had knowledge that his

medical care was deficient.  In short, there is no evidence of intentional, objectively
unreasonable conduct.

Harris's Rule 56.1 statement of additional facts shoots far, but lands short.  It
overpromises and underdelivers.  Time and again, Harris's statement of additional facts proffered
a fact as true, but then cited evidence that does not support it at all.  And again, citations to a
complaint don't count, because a complaint is not evidence.

Consider the following example.  According to Harris, his "treating physician directed
that he be provided with clean living conditions, fresh air, and adequate ventilation."
*See* Pl.'s Statement of Additional Facts, at ¶ 11 (Dckt. No. 59-1).  He cited one passage of his
deposition, and sure enough, counsel asked Harris what orders from a doctor the defendants
failed to follow.  *See* Harris Dep., at 63:5-15 (Dckt. No. 52-5).  But in response, Harris testified
about what he *needs*.  He didn't testify about what the doctor prescribed, or whether the
defendants knew about it and failed to provide it.  Specifically:

> Q:     You also argued that they failed to follow doctors' orders.  What orders
>        did they fail to follow?
>
> A:     Man, this – this becomes a slew of – I'm assuming – I never got no fresh
>        air.  I never – I never was allowed adequate air.  I never was allowed to be
>        – to be inside of a clean vicinity – I mean, a clean facility.  I never was –
>        ain't nothing clean around me.  It's supposed to be clean.  There's nothing
>        around me clean.

*Id.*

That's all there is.  There's no other evidence in the record – meaning a statement of fact
in the Rule 56.1 statements, backed by admissible evidence in the exhibits – that a doctor
prescribed more air, better ventilation, and cleaner cells for Harris.

Harris's statement about the Defendants' knowledge is no better.  In his statement of
facts, Harris contends that "Defendants knew or should have known of Mr. Harris' serious

medical need because Mr. Harris communicated his need verbally and in written grievances."[8]
*See* Pl.'s Statement of Additional Facts, at ¶ 17 (Dckt. No. 59-1). Apart from the complaint
(which doesn't count), Harris cites nothing except the grievances themselves. *Id.*

There is no supporting testimony, affidavit, or declaration showing that two Defendants,
Officer Delitz and Officer Wiggins, ever saw any of the grievances. This Court should not have
to go through the grievances, page by page, hunting for some indication that the officers read
them. That's not this Court's role, to hunt for evidence. *See United States v. Dunkel*, 927 F.2d
955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.");
*Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not
obliged in our adversary system to scour the record looking for factual disputes and may adopt
local rules reasonably designed to streamline the resolution of summary judgment motions.").

But this Court did so, and it cannot find any indication on the face of the grievances
themselves that Officers Delitz and Wiggins ever reviewed them. *See* 6/10/16 Grievance (Dckt.
No. 52-3, at 2 of 7); 6/19/16 Grievance (Dckt. No. 59-3, at 4 of 14); 6/22/16 Grievance (Dckt.
No. 59-3, at 7 of 14); 7/2/16 Grievance (Dckt. No. 52-4, at 2–3 of 4).

Harris says that he picked Officers Delitz and Wiggins as Defendants because he knew
their names and would speak to them more often, but there is no discernible link between these
two officers and the grievances. *See* Harris Dep., at 52:4-7 (Dckt. No. 52-5) ("I mean, I could
have named every officer at CCDOC, but there wasn't enough room and I don't know – I don't
know everybody's name like that."). Harris has no knowledge of whether the two officers ever
read his grievances or responded. *Id.* at 56:21 – 57:12. And Officer Wiggins, for her part,

---

[8] As an aside, "should have known" is a negligence standard, but negligence is not enough to give rise to
a constitutional claim. *See McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018).

testified that she never heard any complaint about panuveitis – and she didn't even know who Harris is. *See* Wiggins Dep., at 19:6-8, 32:7-12, 52:4-8 (Dckt. No. 59-4).

Accordingly, "no evidence shows that [Defendants] were personally responsible for, or even knew of, the conditions about which [Harris] complained." *See Brown v. Picknell*, 2021 WL 3028152, at *3 (7th Cir. 2021); *Hernandez v. Hain*, 2021 WL 3618276, at *7 (N.D. Ill. 2021) ("In this case, Hernandez 'has pointed to no evidence that would permit a reasonable jury to find any of the [Kane County] defendants had any ability to influence' the course of his medical treatment.") (alteration in original). So no reasonable jury could find that Officers Delitz and Wiggins acted unreasonably based on the grievances. *See Brown*, 2021 WL 3028152, at *3.

Next, Harris contends that he "spoke to both Defendants Delitz and Wiggins about his eye condition and about 'trying to get fresh air and stuff like that.'" *See* Pl.'s Statement of Additional Facts, at ¶ 18 (Dckt. No. 59-1). He cites one page of his deposition. But once again, the passage did not live up to its billing.

In the testimony in question, counsel asked Harris how he remembered Officers Delitz and Wiggins. Harris testified: "Well, Ms. Wiggins – I mean, I tended to – to consider them of the divisions. I'm constantly – I'm constantly crossing their paths in multiple divisions. I constantly see – speaking to them about trying to get adequate fresh air and stuff like that, and just being here for a while, I mean, I'm constantly bumping into them, so . . . ." *See* Harris Dep., at 52:10-17 (Dckt. No. 52-5) (ellipsis in original).

That's it. In that passage – and that's all that he cites – Harris did not testify that he told Officers Delitz and Wiggins about his "eye condition." *See* Pl.'s Statement of Additional Facts,

at ¶ 18 (Dckt. No. 59-1).  And he did not testify that he told them that his medical care was inadequate.  Harris simply testified that he told them that he wanted more air.[9]

As a final example, Harris contends that "Defendants failed to abide by directions provided by Mr. Harris' physician that stated Mr. Harris was in need of fresh air and clean ventilation to facilitate his treatment, avoid aggravating his condition, and mitigate the effects of his symptoms."  *See* Pl.'s Statement of Additional Facts, at ¶ 21 (Dckt. No. 59-1).  Notice what's baked into that statement:  the existence of "directions" by a "physician," and Defendants' failure to "abide by" those directions.  *Id.*

Harris cites three passages of his deposition, but they don't lend much of a hand.  In the first passage, Harris testified that Officer Delitz failed to provide "adequate cleaning supplies, allow for adequate time for – for me to get fresh air for my eyes," and failed to "allow[] us to go outside to get the adequate amount of fresh air."  *See* Harris Dep., at 51:4 – 52:7 (Dckt. No. 52-5).  There was no mention of any directive from a doctor to get fresh air and cleaning supplies, let alone any testimony that Officer Delitz knew about any such would-be medical directive.

The other passages aren't better.  The second passage (discussed above) covered his need for fresh air.  *Id.* at 63:5-15.  In the last passage, counsel pressed Harris on the existence of a

---

[9]  In a *different* passage of the deposition – meaning a passage *not* cited by Harris in his Rule 56.1 statement – Harris did testify that Officers Delitz and Wiggins knew that he had panuveitis.  *See* Harris Dep., at 58:23 – 59:3 (Dckt. No. 52-5).  That passage does not count, for two reasons.  First, under the Local Rules, a party must offer facts in a Rule 56.1 statement, and must include supporting citations.  *See* L.R. 56.1(b)(3), 56.1(d), 56.1(e)(3).  Harris did not cite this passage, so it is out of the picture.  Again, this Court has no obligation to hunt through the entire record looking for supporting evidence (even though it did so here).  *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  The adversary system depends on the adversaries themselves building their own cases and doing their own advocacy.  Second, mere knowledge that an inmate has a medical condition is not enough to get to trial against a correctional officer.  It says nothing about whether the guard acted in an objectively unreasonable manner.

medical directive, asking him to identify which doctor supposedly said that the uncleanliness of the jail aggravated his eye condition. In response, Harris couldn't identify anyone:

> Q: Which of your medical providers told you that your panuveitis was aggravated by the sanitation or lack of sanitation?
>
> [Objection omitted]
>
> A: I can't even say which one said that, but just – just through the – just through the – I guess what y'all say through the totality of the circumstances, it just all played in factors. And then when the re-flaring occurred, it was solidified, because I was already on my medication and it – and it re-flared.

*See* Harris Dep., at 80:1-13 (Dckt. No. 52-5).

The Court could go on. Suffice it to say that, after a careful review of the record – meaning facts supported by admissible evidence – Harris has not come close to carrying his burden. The record does not support the notion that Defendants "acted purposefully, knowingly, or perhaps even recklessly." *See McCann*, 909 F.3d at 886. And the record lacks evidence of any objectively unreasonable conduct.

Before turning the page, the Court makes a final point. Correctional officers are non-medical personnel, so they are "presumptively 'entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.'" *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (citation omitted). Indeed, "if a prisoner is under the care of medical experts, a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011); *Miranda*, 900 F.3d at 343 ("When detainees are under the care of medical experts, non-medical jail staff may generally trust the professionals to provide appropriate medical attention.").[10]

---

[10] *Eagan*, *Arnett*, and *Miranda* apply the presumption of reliance on medical staff in the context of an Eighth Amendment claim for deliberate indifference to a substantial risk of serious harm. The Seventh Circuit has indicated that the same presumption applies to inadequate medical care claims under the

That said, a detainee can overcome the presumption if he shows that the jail officials "had reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343; *Dunn v. Manicki*, 2019 WL 11556789, at *3 (N.D. Ill. 2019) ("[Plaintiff] must allege facts sufficient to support an inference that [Defendant] 'knew, or should have known, that [Plaintiff's] condition posed an excessive risk to health or safety' and 'failed to act with reasonable care to mitigate the risk.'") (citing *Miranda*, 900 F.3d at 352–53). In other words, non-medical officials can generally rely on medical personnel, but the non-medical officials "may not *ignore* a detainee's request for care." *See Johnson v. Taylor*, 2020 WL 5891401, at *4 (N.D. Ill. 2020).

Harris has failed to show that the Delitz and Wiggins had "reason to know" that Harris was not receiving appropriate medical attention. So he has failed to present evidence showing the officer acted objectively unreasonably.[11]

### III. Official Capacity Claims – Inadequate Medical Care and Conditions of Confinement

Harris also brings inadequate medical care claims against the two officers in their official capacities, and brings conditions-of-confinement claims against Sheriff Dart and Cook County.

---

Fourteenth Amendment. *See Redman v. Downs*, 854 F. App'x 736, 739 (7th Cir. 2021) (citing *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017); *Miranda*, 900 F.3d at 343–44). And multiple district courts have held that non-medical staff may rely on the judgment of medical personnel in analyzing Fourteenth Amendment inadequate medical care claims against jail officials. *See, e.g.*, *Ford v. County of Winnebago*, 2022 WL 180569, at *6 (N.D. Ill. 2022); *Nicholson v. Kramer*, 2021 WL 3367168, at *4 (N.D. Ill. 2021); *Hernandez v. Hain*, 2021 WL 3618276, at *7 (N.D. Ill. 2021); *Johnson v. Taylor*, 2020 WL 5891401, at *4 (N.D. Ill. 2020); *Bernard v. Scott*, 501 F. Supp. 3d 611, 624 (N.D. Ill. 2020); *Dunn v. Manicki*, 2019 WL 11556789, at *3 (N.D. Ill. 2019). So the Court applies the same presumption.

[11] Qualified immunity is an issue, too, but there is no need for the Court to reach it given the lack of evidence.

20

In their motion for summary judgment, Defendants argue that the County is an improper defendant because it cannot be held responsible for the policies and practices of the Sheriff's Office. *See* Mem. in Support of Defs.' Mtn. for Summ. J., at 5 (Dckt. No. 52-2).

Harris responds that the County remains a proper defendant because state law requires the County to pay judgments entered against the Sheriff in his official capacity. *See* Pl.'s Mem., at 11 (Dckt. No. 59). Harris is correct. *See Carver v. Sheriff of LaSalle Cnty.*, 203 Ill. 2d 497, 272 Ill. Dec. 312, 787 N.E.2d 127, 136–38 (2003); *Carver v. Sheriff of LaSalle Cnty*, 324 F.3d 947, 948 (7th Cir. 2003) (citing Fed. R. Civ. P. 17, 19); *see also Wilson v. Cook County*, 2020 WL 5642945, at *3 n.3 (N.D. Ill. 2020) (noting that Cook County "must remain a party for indemnification purposes to the extent that any claims proceed against . . . Dart").

In their motion for summary judgment, Defendants did not address the merits of the official capacity claims, including the conditions-of-confinement claim against Sheriff Dart. Harris cannot hold Sheriff Dart liable in his official capacity based on *respondeat superior*. *See Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015). But Harris can advance a claim against Sheriff Dart under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 694 (1978).

"The liability of the Sheriff's Department and of the County is derivative of [Dart's] official-capacity liability, and the official-capacity liability is subject to [the] holding in *Monell* . . . ." *Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (citing *Monell*, 436 U.S. at 694). "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'" *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (cleaned up) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

21

But in their reply brief, Defendants unveiled a new argument, challenging the *Monell* claim on the merits. *See* Defs.' Reply in Supp. of Defs.' Mtn. for Summ. J., at 6–7 (Dckt. No. 61). Defendants argue that Harris's claim fails because he did not identify an express policy or widespread practice, and did not offer evidence that any such policy or practice affected other inmates. *Id.*

That argument came late in the game – too late, unless the Court gives Harris an opportunity to respond. A party waives or forfeits arguments raised for the first time in a reply brief. *See Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011). And this Court cannot *sua sponte* grant summary judgment on grounds not raised by a party without giving notice and a reasonable time to respond. *See* Fed. R. Civ. P. 56(f)(2).

So the Court is giving Harris notice, and is giving him an opportunity to respond. The Court is considering whether Harris has a meritorious basis to bring official capacity claims against the two officers about inadequate medical care. And the Court is contemplating whether Harris has a basis for a conditions-of-confinement claim against Sheriff Dart. In addition to the arguments advanced by Defendants, this Court is considering whether to grant summary judgment on the inadequate medical care claims and the conditions-of-confinement claim because Harris has not submitted any evidence of an underlying constitutional violation. *See Sallenger v. City of Springfield*, 630 F.3d 499, 505 (7th Cir. 2010) (holding that when "there is no underlying constitutional violation, [a] City cannot be liable under *Monell*").

Basically, this Court is considering entering summary judgment against Harris on everything left in the case. The Court is not reopening the record, and is not allowing Harris to present any new evidence. The Court simply gives Harris an opportunity to respond to the viability of the claims, given the facts already in the record.

22

Perhaps Harris will decide not to come to the defense of the remaining claims. But if he intends to do so, the time is now. Or, more precisely, two weeks from now. Any response on the viability of the remaining claims is due no later than two weeks after entry of this Opinion.

## Conclusion

For the reasons stated above, Defendants' motion for summary judgment is granted in part. The Court grants summary judgment to the officers on the individual capacity claims (and to Sheriff Dart, to the extent that the complaint advanced individual capacity claims against him at all). The Court defers its ruling on the remaining claims.

Date: February 11, 2022

_____

Steven C. Seeger
United States District Judge