**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ANTHONY HARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 19-cv-4598 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THE COUNTY OF COOK, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

Anthony Harris, a pretrial detainee, contracted an eye disease while incarcerated at the Cook County Jail. He blames the jail for the disease. So he sued the correctional officers, the Cook County Sheriff, and Cook County itself, alleging inadequate medical care and unconstitutional conditions of confinement.

Defendants moved for summary judgment on both claims, but some of the arguments made a late-breaking appearance. In their opening brief, Defendants largely focused on the individual-capacity claims about the medical care. But then, in their reply brief, Defendants addressed *Monell* and unveiled a new set of arguments.

This Court issued an opinion that resolved only part of the motion. The Court granted summary judgment to the officers on the individual-capacity claims about the medical care. The Court also granted summary judgment to Sheriff Dart on the individual-capacity claim about the conditions of confinement. At that point, the individual-capacity claims left the scene, and only the official-capacity claims were left.

But this Court stopped short of addressing the arguments about *Monell*. Defendants raised them for the first time in their reply brief, so Harris didn't have a chance to respond. This Court invited Harris to file a sur-reply.

Harris accepted that invitation and submitted a supplemental filing. In the end, Harris abandoned the official-capacity claims about the adequacy of medical care. But Harris defended the *Monell* claim about the conditions of confinement. He supplemented the record, too.

The last remaining claim is the official-capacity claim about the conditions of confinement. For the following reasons, Defendants' motion for summary judgment is granted.

## Background

This Court assumes familiarity with its earlier summary judgment opinion, and with the facts of the case generally. *See* 2/11/22 Mem. Opin. and Order (Dckt. No. 64). For now, the Court will simply offer a refresher.

Anthony Harris is a pretrial detainee at the Cook County Department of Corrections. *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 1 (Dckt. No. 59-1). In 2016, the medical staff at Stroger Hospital diagnosed Harris with an eye disease called panuveitis, a chronic inflammatory condition that affects major parts of the eye. *Id.* at ¶ 4. If left untreated, the disease could lead to permanent vision loss, retinal detachment, optic nerve damage, and cataracts. *See* Defs.' Resp. to Pl.'s Statement of Additional Facts, at ¶ 4 (Dckt. No. 61-1).

Since that diagnosis, Harris "has been regularly seen by doctors and he has been prescribed a variety of eye drops, oral medications, and eye injections." *See* Pl.'s Resp. to Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 59-1). Harris also received eye and blood tests that ruled out non-environmental triggers for the disease. *Id.* at ¶ 8.

2

Two years later, in May 2018, Harris was placed in the Residential Treatment Unit ("RTU"), a special medical unit for detainees receiving medical treatment. *Id.* at ¶ 15. The parties do not reveal when Harris left the RTU (if ever). *Id.*; *see* Harris Bed Assignment, at 2 (Dckt. No. 59-2) (listing Harris's bed assignment until February 2020).

Harris believed that the RTU was filthy, and that inmates weren't given enough time outside. He thought that the conditions in the jail led to his eye disease. So he went to the federal courthouse.

Harris filed a *pro se* complaint alleging that the living conditions caused and aggravated his eye condition, and that the jail staff failed to respond to his requests. *See* Cplt. (Dckt. No. 1). Judge Feinerman, this Court's predecessor before reassignment, appointed him counsel.[1]

Harris later filed an amended complaint against Correctional Lieutenant Damita Delitza, Correctional Lieutenant Darnice Wiggins, Unnamed Correctional Officers of the Cook County Department of Corrections, Cook County Sheriff Thomas Dart, and Cook County. *See* Am. Cplt. (Dckt. No. 18).

The amended complaint includes two claims under 42 U.S.C. § 1983. First, Harris brought a claim about his medical care against Delitz, Wiggins, and Unnamed Correctional Officers of the Cook County Department of Corrections. *Id.* at ¶¶ 21–29. Second, he brought a conditions-of-confinement claim against Sheriff Dart and Cook County. *Id.* at ¶¶ 30–35.

Harris sued the individual Defendants in both their individual and official capacities. *Id.* at 1. In effect, he sued the person and the position (meaning the entity).

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

---

[1] This Court thanks William Ziegelmueller and Sarah Oligmueller of ArentFox Schiff LLP for the many years of capable *pro bono* service.

In contrast, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.* (citation omitted); *see also First Midwest Bank ex rel. Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) ("A municipality is a 'person' under § 1983 and may be held liable for its own violations of the federal Constitution and laws.") (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978)).

So, breaking it down, Harris actually brought four claims: (1) a medical-care claim against the officers in their individual capacities; (2) a medical-care claim against the officers in their official capacities (*i.e.*, a *Monell* claim); (3) a conditions-of-confinement claim against Sheriff Dart in his individual capacity; and (4) a conditions-of-confinement claim against Sheriff Dart in his official capacity and against Cook County (*i.e.*, another *Monell* claim).

Defendants moved for summary judgment on all claims. Defendants argued that Harris failed to exhaust his administrative remedies. *See* Mem. in Support of Defs.' Mtn. for Summ. J., at 5–7 (Dckt. No. 52-2). Defendants also argued that Cook County is not a proper defendant because it had no control over the jail's policies. *Id.* at 5. Finally, Defendants argued that the individual officers acted reasonably in responding to Harris's medical needs. *Id.* at 7–12.

This Court rejected the exhaustion argument as untimely. Early in the case, this Court set a deadline of July 15, 2020 for Defendants to bring any motion about a lack of exhaustion. *See* 5/20/20 Order (Dckt. No. 34). This Court did so because the Seventh Circuit encourages an early resolution of exhaustion issues. *See Wagoner v. Lemmon*, 778 F.3d 586, 591 (7th Cir. 2015); *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014); *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008).

Defendants didn't meet that deadline. In fact, they missed the deadline by a long shot. Defendants filed a motion about the exhaustion issue for the first time in June 2021. *See* Defs.'

Mtn. for Summ. J. (Dckt. No. 52). That's 11 months late. So, this Court ruled that Defendants had forfeited any exhaustion defense by missing this Court's deadline by almost a year. *See* 2/11/22 Mem. Opin. and Order, at 10–13 (Dckt. No. 64).

This Court also rejected the notion that Cook County is an improper party. *Id.* at 21. The County belongs in the case because state law requires the County to pay judgments against the Sheriff in his official capacity. *See Carver v. Sheriff of LaSalle Cnty.*, 787 N.E.2d 127, 136–38 (2003); *Carver v. Sheriff of LaSalle Cnty.*, 324 F.3d 947, 948 (7th Cir. 2003).

Defendants fared better on the claim about the adequacy of the medical care. This Court held that Harris had failed to come forward with sufficient evidence that the officers acted "purposefully, knowingly, or even recklessly" in response to Harris's medical condition. *See* 2/11/22 Mem. Opin. and Order, at 19 (Dckt. No. 64). The record also lacked evidence that the officers acted in an objectively unreasonable manner. *Id.* at 19–20. So, the Court granted the motion for summary judgment on the medical-care claim against the officers in their individual capacities. *Id.* at 20.

This Court also granted summary judgment to Sheriff Dart on the individual-capacity claim about the conditions of confinement. The record did not include any evidence about any actions personally taken by Sheriff Dart. *Id.* at 13 n.7. Harris did not argue otherwise.

Basically, this Court granted summary judgment on both of the individual-capacity claims. After that ruling, only two claims were left: the medical-care claim against the individual officers in their official capacities, and the conditions-of-confinement claim against Sheriff Dart in his official capacity and against Cook County.

Both claims rely on a *Monell* theory of liability. That is, an official-capacity claim is functionally the same as suing the entity, so Harris needed to establish a basis for holding the

5

municipality itself liable.  Under *Monell*, a municipality has no vicarious liability, so a plaintiff needs to show that the municipality has culpability based on the municipality's own actions.

Defendants did make an argument about *Monell*, but the argument arrived late in the game.  Defendants moved for summary judgment on all claims, but the opening brief didn't mention *Monell*.  The argument appeared for the first time in the reply brief.  *See* Defs.' Reply in Supp. of Defs.' Mtn. for Summ. J., at 6–7 (Dckt. No. 61).

So, when it issued its opinion, this Court held off on resolving the *Monell* issues.  The Court gave Harris a chance to file a supplemental brief, and address the *Monell* arguments that appeared in the reply brief.  *See* 2/11/22 Mem. Opin. and Order, at 20–23 (Dckt. No. 64).

Oftentimes, courts will flatly reject arguments that appear for the first time in a reply brief.  But not always.  It depends on the situation.

Here, the arguments seemed potentially meritorious.  It seemed like a better use of the resources of the parties and the Court to get to the bottom of the issue at the summary judgment stage.  Going to trial is a heavy lift for everyone, including the parties, the public, and the Court. Before imposing that cost, the Court elected to fully vet the claim at the summary judgment stage.  Kicking the tires on the claim seemed potentially worthwhile.

So, this Court extended an invitation to Harris to file a sur-reply.  As this Court explained, "The Court is considering whether Harris has a meritorious basis to bring official capacity claims against the two officers about inadequate medical care.  And the Court is contemplating whether Harris has a basis for a conditions-of-confinement claim against Sheriff Dart.  In addition to the arguments advanced by Defendants, this Court is considering whether to grant summary judgment on the inadequate medical care claims and the conditions-of-

confinement claim because Harris has not submitted any evidence of an underlying constitutional violation." *See* 2/11/22 Mem. Opin. and Order, at 22 (Dckt. No. 64).

Along the way, this Court added that it was "not reopening the record," and was "not allowing Harris to present any new evidence." *Id.* This Court repeated that point in follow-up minute orders. *See* 3/1/22 Order (Dckt. No. 66); 3/8/22 Order (Dckt. No. 68).

Admittedly, that phraseology didn't perfectly capture what this Court was trying to say. The point was that Harris could not use the sur-reply to plug holes that this Court already spotted in its ruling on the *other* claims, meaning the individual-capacity claims. There was no do-over.

That is, this Court ruled that Harris did not offer sufficient evidence to support individual-capacity claims against the officers or Sheriff Dart. So, this Court was trying to say that Harris could not use the sur-reply to revisit that ruling and fill evidentiary holes. A sur-reply was not an opening for back-filling.

This Court did not allow a second bite at the apple when it came to the individual-capacity claims. But the Court did allow a first bite at the apple on the official-capacity claims. Defendants raised those arguments for the first time in their reply brief. So this Court did allow Harris to supplement the record when it came to *Monell*.

This Court cemented the point in a later order, in the hope of providing "greater clarity about what Plaintiff can and cannot submit in support of a sur-reply." *See* 3/14/22 Order (Dckt. No. 69). "Plaintiff cannot submit any new evidentiary material in the hope of filling the evidentiary holes that this Court already identified in its Opinion. The Court is not revisiting that Opinion, and is not giving Plaintiff another bite at the apple." *Id.*

"But Plaintiff can submit a brief to address the remaining claims, meaning the official capacity claim against Sheriff Dart and the *Monell* claim against Cook County about the

conditions of confinement. In particular, Plaintiff can present evidence on whether he can satisfy the requirements of *Monell*. Plaintiff also may present evidence about whether he suffered an underlying constitutional violation from the conditions of confinement. This Court grants that opportunity because Defendants made a new argument int their reply brief." *Id.*

Harris filed a sur-reply (Dckt. No. 65), and then an updated sur-reply after receiving this Court's guidance about what is fair game (Dckt. No. 71). Harris expressly abandoned the official-capacity claim against the individual officers about the medical care. *See* Pl.'s First Sur-Reply, at 1 (Dckt. No. 65) ("In light of the Court's ruling, Plaintiff will not pursue official capacity claims against the individuals named as Defendants in Count I of Plaintiff's Amended Complaint.").

But Harris did come to the defense of his official-capacity claim about the conditions of confinement. Harris argued that he did, in fact, submit enough evidence to get to a jury on that claim. He supplemented the record on the official-capacity claim (which is fine), and this Court took that material into account when reaching the decision at hand.

All of this is a long way of saying a simple point: only one claim is left. This Court must decide whether Harris has offered evidence that could support a finding of municipal liability under *Monell* on the conditions-of-confinement claim.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of

establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving him the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

The Court starts by paving the road and laying some groundwork for the last remaining claim. Harris brings a conditions-of-confinement claim against Sheriff Dart in his official capacity and against Cook County.

For all intents and purposes, an official-capacity claim is the same thing as a claim against the municipality itself. It is akin to suing the uniform, instead of the person wearing it.

For that reason, an official-capacity claim must pass muster under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015); *Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007) (noting that "official-capacity liability is subject to [the] holding in *Monell*"); *Felton v. Bd. of*

*Comm'rs*, 5 F.3d 198, 201 (7th Cir. 1993) ("It is well established that an official capacity suit is synonymous with a suit against the entity itself.").

Section 1983 does not allow liability based on *respondeat superior*. *See Est. of LaPorta*, 988 F.3d at 986. Under *Monell*, a municipality is not vicariously liable for the torts of its employees or agents. *Id.*

So, no matter how you slice it, the conditions-of-confinement claim seeks to hold Cook County liable. But the County can't be on the hook for the conduct of others. Municipal liability depends on municipal conduct.

In any *Monell* claim against a municipality, "the plaintiff must begin by showing an underlying constitutional violation." *See Schor v. City of Chicago*, 576 F.3d 775, 779 (7th Cir. 2009); *see also Est. of LaPorta*, 988 F.3d at 987 ("[T]he plaintiff must initially prove that he was deprived of a federal right. That's the first step in every § 1983 claim, including a claim against a municipality under *Monell*."). Without an underlying constitutional violation, there's nothing to hold the municipality liable *for*.

After reviewing the record as a whole, the Court concludes that Harris failed to submit evidence of an underlying constitutional violation. That lack of evidence dooms his *Monell* claim. But even if he did submit evidence of a constitutional violation, his *Monell* claim would fail because he has not shown that the County *itself* was responsible for any alleged violation.

## I.    Unconstitutional Conditions of Confinement

A threshold question is whether the record includes sufficient evidence of a constitutional violation. No constitutional violation, no *Monell* claim.

Pretrial detainees may bring a conditions-of-confinement claim if they face "adverse conditions that deny the minimal civilized measure of life's necessities." *See Johnson v. Foster*,

2020 WL 5891405, at *2 (N.D. Ill. 2020) (quoting *Hardeman v. Curran*, 933 F.3d 816, 821–22 (7th Cir. 2019)).  For pretrial detainees, that right derives "from the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment."  *See Smith v. Dart*, 803 F.3d 304, 309 (7th Cir. 2015).

"[T]o prevail on a claim alleging unconstitutional conditions of pretrial confinement, the plaintiff must prove three elements:  (1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable – that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'"  *See Hardeman v. Curran*, 933 F.3d 816, 827 (7th Cir. 2019) (Sykes, J., concurring) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)).

The standard for a conditions-of-confinement claim "includes both an objective and subjective component."  *See Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021).  The Constitution comes into play only when the conditions are "objectively [and] sufficiently serious."  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  A defendant's conduct must be objectively unreasonable, after considering the "totality of facts and circumstances."  *McCann v. Ogle Cnty.*, 909 F.3d 881, 886 (7th Cir. 2018); *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020).  But a subjective standard applies to a defendant's state of mind, because the standard is deliberate indifference.  A plaintiff must show that a defendant "acted purposefully, knowingly, or perhaps even recklessly" when it came to the conditions of confinement.  *See Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018).

The Constitution sets the floor, and the floor is low. The Due Process Clause sets minimum requirements for the treatment of detainees, so "extreme deprivations are required to make out a conditions-of-confinement claim." *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). Needless to say, the political branches can raise the floor (by statute), and can build a high-rise of rights if they want to. But in the meantime, the Constitution merely sets the bedrock.

An objectively serious condition poses "an excessive risk to health or safety." *Epps v. Patriquin*, 2020 WL 4505875, at *3 (N.D. Ill. 2020) (quotation marks omitted). The condition must result in "the denial of a basic human need" like "adequate food, clothing, shelter, and medical care." *See Miller v. Winnebago Cnty. Sheriff's Off.*, 2019 WL 184078, at *2 (N.D. Ill. 2019) (citing *Smith*, 803 F.3d at 309).

The Fourteenth Amendment applies to pretrial detainees, but case law under the Eighth Amendment sheds light on a claim about the conditions of confinement. The constitutional hook is different, but the standard for a claim is the same. After all, a pretrial detainee can't be punished, so a pretrial detainee can't be treated worse than a prisoner (who can be punished). *See King v. Kramer*, 680 F.3d 1013, 1017 (7th Cir. 2012) ("Detainees are entitled to no less protection than prisoners whose treatment must meet the standards of the Eighth Amendment."); *Love v. Dart*, 2022 WL 797051, at *3 (N.D. Ill. 2022) ("[T]he Fourteenth Amendment's objective test for pretrial conditions of confinement claims and the objective prong of the Eighth Amendment's deliberate indifference standard are substantially equivalent analyses . . . ."); *see also Jump v. Village of Shorewood*, 42 F.4th 782, 793 (7th Cir. 2022) ("Pretrial confinement claims like Jump's – whether characterized as arising under the Fourth or Fourteenth Amendment – are analyzed via the objective reasonableness standard.") (footnote omitted).

12

Harris brings a claim about the conditions of confinement over a six-year period, and he brings a basket of arguments to the table. He argues that he experienced: (1) inadequate cleaning supplies for his housing tier; (2) stained clothing and bedding; (3) showers clogged with food scraps;[2] (4) mold in the showers; (5) limited recreational time outside; (6) no open windows; (7) dirty ventilation ducts; and (8) exposure to paint fumes. *See* Pl.'s Second Sur-Reply, at 12–14 (Dckt. No. 71).

For the sake of clarity, the Court combines these conditions into two categories. The first four conditions (cleaning supplies, stained clothing and bedding, dirty showers, and mold in the showers) go to the general sanitation and hygiene of the facility.[3] The final four conditions (limited time outside, no open windows, dirty ventilation ducts, and paint fumes) go to the adequacy of the jail's ventilation.

In other words, the case is about clean things, and clean air.

The Seventh Circuit has held that a lack of sanitation and ventilation can give rise to a constitutional claim, if the deprivation is sufficiently serious. *See Hardeman*, 933 F.3d at 820 (observing that "the minimal civilized measure of life's necessities" includes "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities") (quotation marks

---

[2] In his supplemental brief, Harris says that he was "denied adequate means to clean dishes" because he allegedly washed his dishes in the shower. *See* Pl.'s Second Sur-Reply, at 12 (Dckt. No. 71). But in the same brief, he points only to evidence that his shower was dirty because of grease and food scraps, not that he lacked clean dishes. *Id.* at 10. Dirty showers and inadequately clean eating utensils are separate theories of liability. If Harris intended to bring a conditions-of-confinement claim based on inadequately clean dishes, it would fail. Harris does not submit any evidence of a substantial risk to his health or safety based on dirty dishes. *Cf. Byrd v. Hobart*, 761 F. App'x 621, 624 (7th Cir. 2019) (denying summary judgment where a plaintiff provided evidence that the prison kitchen was so overrun with mice and cockroaches as to create an unsanitary environment that presented a "substantial and obvious" "risk of . . . foodborne illness or worse").

[3] Harris's supplemental brief does not specify if his conditions-of-confinement claim targets the RTU specifically, or the jail more generally. The Court's analysis remains the same as applied to either location.

omitted); *Davis v. Williams*, 216 F. Supp. 3d 900, 908 (N.D. Ill. 2016) ("The Seventh Circuit has continually espoused a prisoner's right to adequate ventilation.") (collecting cases).

To survive summary judgment, Harris also must point to some harm or risk of future harm that he experienced based on those deprivations. *See Gray v. Hardy*, 826 F.3d 1000, 1006 (7th Cir. 2016) ("Gray must do more than demonstrate a triable issue of fact with respect to the conditions he faces; he must also show that he suffered some cognizable harm from the overall lack of a sanitary environment . . . ."); *Towns v. Dart*, 2017 WL 4572209, at *3 (N.D. Ill. 2017). In the context of inadequate ventilation, Harris must show evidence of a "direct physical manifestation of the harm caused by the poor ventilation, as well as the quite likely possibility for future health problems." *See Davis*, 216 F. Supp. 3d at 908 (quoting *Board v. Farnham*, 394 F.3d 469, 486 (7th Cir. 2005)).

In effect, there are two layers of causation for a *Monell* claim about the conditions of confinement. A plaintiff must establish that a condition caused an injury to establish a constitutional violation. And then, a plaintiff must establish that the municipality's policy or practice caused the condition (*i.e.*, moving-force causation, which the Court will cover later).

The Court begins by analyzing conditions separately, before considering the combined effect of all eight conditions. Analyzing the conditions individually, Harris has not submitted evidence of sufficiently serious deprivations of sanitation or ventilation. Viewing the conditions as a whole doesn't change the outcome. Overall, Harris has not submitted evidence of a sufficiently serious deprivation to survive summary judgment.

### Clean Things

The Court begins with Harris's first four allegations, which go to the jail's general sanitation and cleanliness.

14

Harris begins with an argument about the amount of cleaning supplies in the housing tier. Harris admits that detainees received a mop, bucket, brooms, scrub brushes, and a liquid cleaner. *See* Pl.'s Second Sur-Reply, at 8 (Dckt. No. 71) (citing Delitz Dep., at 19:13-22 (Dckt. No. 71-3)). Each tier also received two 32-ounce spray bottles of liquid cleaner per day, and the detainees were responsible for cleaning the place. *See* Harris Decl., at ¶ 7 (Dckt. No. 71-1).

Nonetheless, Harris argues that "this amount [of cleaner] has never been enough to adequately clean the tier." *Id.* He contends that because of insufficient supplies, "there has constantly been dirt and filth all over the Jail, including on the walls and floor of the living tiers, sleeping quarters, and bathroom and shower facilities." *Id.* at ¶ 8. He also says that the facility remains dirty because the correctional officers do not train, inspect, or assist in the cleaning process. *Id.* at ¶ 5 ("[N]obody ever trained me, or any other detainee, [on] how to clean properly.").

He makes the same basic allegations based on clothing, bedding, and the showers. Harris admits that detainees' uniforms and personal items were laundered twice per week, and linens and bedding were laundered once per week. *See* Pl.'s Second Sur-Reply, at 11 (Dckt. No. 71). Still, Harris complains that the laundry process "isn't sufficient to get anything clean." *See* Harris Decl., at ¶ 11 (Dckt. No. 71-1). He says that the uniforms retain "stains and mess" on them, along with "dirt from a prior inmate." *Id.*; *see also* Harris Dep., at 45:1-12 (Dckt. No. 52-5) (describing his bedding as "dirty" and his clothing as having "stains").

Harris also acknowledges that he has cleaning supplies for the showers. *See* Harris Decl., at ¶ 9 (Dckt. No. 71-1). He was able to sufficiently clean any mold in his living quarters because correctional officers gave him soap, water, and bleach. *See* Harris Dep., at 41:20 – 42:10 (Dckt. No. 52-5). But he argues that the cleaning supplies are insufficient to fully eradicate the mold in

15

the showers. *Id.* ("I and other detainees have tried to clean the mold with the cleaning fluid provided, but the solution doesn't kill the mold and it grows right back.").

By his own admission, Harris has received cleaning supplies and can clean the housing tier daily. His linens and bedding are laundered every week. And he has supplies to clean mold in his living quarters and showers. He just wants more, and wants something better.

Again, only "extreme" deprivations can give rise to a conditions-of-confinement claim. *See Giles*, 914 F.3d at 1051. The Fourteenth Amendment is not violated "when the hygienic conditions in a prison do not meet the prisoner's personal standards of cleanliness." *See Downs v. Carter*, 2016 WL 1660491, at *10 (N.D. Ill. 2016) (quoting *Jordan v. Peters*, 2000 WL 149256, at *4 (N.D. Ill. 2000)).

The Constitution does not mandate impeccable housing or "the amenities, conveniences and services of a good hotel." *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988); *see also Tesch v. County of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (rejecting an Eighth Amendment claim where the plaintiff "was not denied any of his basic human necessities; he just did not receive the level of comfort that he demanded"). "Prison conditions 'may be uncomfortable, even harsh, without being inhumane.'" *See Buchanan v. Pfister*, 2020 WL 902829, at *8 (N.D. Ill. 2020) (quoting *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017)). The Constitution does not require a visit by Mr. Clean himself.

Most of us have seen stains on our clothing, too. And spotting mold in a shower isn't unheard of, either. It's not the type of thing that would inspire a feeling that basic standards of civilization are going down the drain. It may not satisfy the standards of Tide or Lysol, but it does not violate the standards of James Madison.

The simple reality is that Harris can clean his housing tier and showers. Courts frequently hold that a conditions-of-confinement claim about inadequate sanitation cannot survive when the inmate has an ability to clean. *See, e.g.*, *Murithi v. Hardy*, 2016 WL 890695, at *7 (N.D. Ill. 2016) (holding that a cell was not unconditionally unhygienic because the plaintiff "admit[ted] that he was able to clean his cell twice per week using towels and shampoo he purchased from [the] commissary, and he admit[ted] that cleaning supplies became available towards the end of his stay in B house"); *Sanchez v. Walker*, 2010 WL 5313815, at *9–10 (N.D. Ill. 2010) (holding that a lack of cleaning supplies did not result in a constitutional violation because the plaintiff could have used available water and clothing to clean his cell); *Gurley v. Sheahan*, 2009 WL 2178685, at *8 (N.D. Ill. 2009) (holding that an unclean bathroom was not an unconstitutional condition of confinement because the plaintiff "admit[ted] that he was provided with cleaning materials, including Ajax, a mop, and a broom, twice a day to clean the lavatories"); *see also Maxie v. Bruemmer*, 2016 WL 3597578, at *3 (N.D. Ind. 2016) ("The mere presence of some dirt, mold, or mildew at the jail does not establish the type of severe deprivation needed to establish a constitutional violation.") (citing *Carroll v. DeTella*, 255 F.3d 470, 473 (7th Cir. 2001)).

The Seventh Circuit recognizes constitutional violations for inadequate cleaning supplies "only in extreme circumstances." *See Gray*, 826 F.3d at 1005–06 (collecting cases). Harris's statements about dirty walls and unspecified "filth" in the living tier don't rise to that level. *See, e.g.*, *McKinley v. Schoenbeck*, 731 F. App'x 511, 516 (7th Cir. 2018) (reversing grant of summary judgment to defendants where the plaintiff had no cleaning supplies and his cell "lacked heat or hot water in the winter and had rodent feces and urine on the floor"); *Cobian v. McLaughlin*, 717 F. App'x 605, 611 (7th Cir. 2017) (holding that a segregation cell with human

feces "splashed . . . everywhere" and no cleaning supplies stated a claim under the Eighth Amendment); *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) (recognizing an Eighth Amendment claim when the detainee's cell "had broken windows, exposed wiring, extensive rust, sinks without running water, toilets covered in mold and spider webs, and a broken heating system" and the jail "furnished the inmates with no supplies to clean for themselves"); *Vinning-El v. Long*, 482 F.3d 923, 923–24 (7th Cir. 2007) (reversing grant of summary judgment where the prisoner was placed in a cell with blood and feces on the walls, "without a mattress, sheets, toilet paper, towels, shoes, soap, toothpaste, or any personal property" with which to clean).

Similarly, Harris's clothing and bedding are washed each week – he focuses on *residual* stains and dirt. Stains and dirt can be persistent. That's why there are entire industries devoted to wiping them out (and wiping them away).

Even so, the Constitution does not require pristine clothing and bedding. On this record, no reasonable jury could conclude that the existence of stains presented a problem of constitutional proportions. The lack of cleanliness was not "extreme." *See Gray*, 826 F.3d at 1005–06. And a lack of cleanliness is not a constitutional violation when there is no risk of serious harm. *See Myers v. Ind. Dep't of Corr.*, 655 F. App'x 500, 503 (7th Cir. 2016) (dismissing a conditions-of-confinement claim based on inadequately washed clothing because "[d]eficiencies in whiteness and freshness alone . . . do not fall short of the minimal necessities that the Eighth Amendment requires for basic dignity," and the plaintiff didn't "allege that it left any residue that might transmit serious diseases"); *Passmore v. Josephson,* 376 F. Supp. 3d 874, 881 (N.D. Ill. 2019) ("[T]he issuance of dirty underwear to Passmore and refusal to allow him to exchange it was not sufficiently serious to support his conditions of confinement claim."); *see also Walker v. Dart*, 2010 WL 669448, at *4 (N.D. Ill. 2010) ("Being denied clean clothes for

18

two weeks, though unpleasant, is not a deprivation serious enough to support an Eighth Amendment claim.").

The same goes for the food scraps in the shower drains, and the mold in the shower. On this record, no reasonable jury could conclude that the problem was extreme. *See Gray*, 826 F.3d at 1005–06.

In sum, Harris's first four conditions based on general sanitation (*i.e.*, cleaning supplies, stained clothing and bedding, dirty showers, and mold in the showers) do not rise to the level of constitutional deprivations when considered on their own.

### *Clean Air*

The next set of conditions involves inadequate ventilation (*i.e.*, limited time outside, no open windows, dirty ventilation ducts, and paint fumes). The claim fares no better.

Harris first contends that he does not receive enough time outside because of the jail's recreation schedule. While the schedule gives detainees outside recreation when the temperature stays between 45°F to 85°F, he argues that correctional officers would frequently keep the recreation time indoors "even when the weather [was] perfect." *See* Harris Decl., at ¶ 3 (Dckt. No. 71-1); Recreation Schedule (Dckt. No. 71-2). Harris says that he has, at times, gone weeks or months without outdoor recreation. *Id.* But during those periods he would still have indoor recreation. *See* Harris Decl., at ¶ 3.

Note that Harris does not say that he was denied exercise time, which could qualify as a serious deprivation. *See Gurley v. Sheahan*, 2009 WL 2178685, at *8 (N.D. Ill. 2009) ("There is a significant difference between a lack of outdoor recreation and an inability to exercise."); *Walker v. Dart*, 2010 WL 669448, at *4 (N.D. Ill. 2010) (explaining that a lack of exercise may amount to a constitutional violation in "extreme and prolonged situations in which the lack of

movement threatens the inmate's health").  Instead, he could always exercise.  Sometimes, he exercised inside, even when the weather made outside time more enticing.

So Harris received outdoor time and had two days of guaranteed recreation (indoor or outdoor) per week.  Once again, he simply wants more.  But wanting more does not mean that the Constitution *requires* more.  Almost everyone wants to go outside on sunny, good-weather days.  Even so, the Constitution does not require outside time when the weather is "perfect."

Next, Harris points to a lack of ventilation because of the lack of windows, the dirty HVAC system, and the exposure to paint fumes.  *See* Pl.'s Second Sur-Reply, at 6–8 (Dckt. No. 71).  He says the air ducts are constantly "clogged thick with dirt" and the vents have "inches of grime that have built up over the years."  *See* Harris Decl., at ¶ 9 (Dckt. No. 71-1).  And he contends that the jail unnecessarily exposed him to paint fumes when it painted the entire tier while he was playing basketball, which contaminated the air.  *See* Harris Dep., at 18:1-11 (Dckt. No. 52-5).

Based on the record, the ventilation is not ideal, but it is not so extreme that it fails constitutional standards.  *See Farmer*, 511 U.S. at 834; *Giles*, 914 F.3d at 1051.  It sounds unclean, but not constitutionally inadequate.

Causation looms large, too.  Harris must point to evidence of a cognizable injury based on the conditions of confinement.  He cannot rely on his own guesswork to show that inadequate ventilation caused an eye injury.  He must present evidence that the conditions of confinement caused the injury.

Harris had not laid the evidentiary foundation for a connection between the conditions of confinement (*i.e.*, the ventilation) and the medical condition (*i.e.*, the eye disease).  At the summary stage, a belief or a theory isn't enough.  *See Walker v. Dart*, 2010 WL 3307079, at *6

(N.D. Ill. 2010) ("'[C]onclusory allegations, without backing from medical or scientific sources, that the rank air exposed [plaintiff] to diseases and caused respiratory problems which he would not otherwise have suffered' are insufficient to survive summary judgment.") (quoting *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997)); *see also Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008) ("The peeling paint or an unpleasant odor in a cell described in this record, along with the absence of any evidence of serious injury, does not amount to constitutional deprivation.").

In response, Harris argues that his panuveitis qualifies as a cognizable injury. He also argues that *all* his conditions of confinement, considered together, aggravated his eye condition. *See* Pl.'s Second Sur-Reply, at 12 (Dckt. No. 71). According to Harris, "[e]ven if none of the above conditions alone amounts to a constitutional violation, the combination of these conditions certainly does." *Id.*

Following Harris's lead, the Court will jump ahead and consider all of the conditions as a whole.

### Cumulative Case

A plaintiff may establish a constitutional violation based on a group of conditions, even if the conditions are inadequate when standing alone. *See Hall v. Nicholson*, 2022 WL 407649, at *3 (N.D. Ill. 2022). In these "combined-conditions" cases, a violation remains possible "when the deprivations have a mutually enforcing effect which produces the deprivation of a single, identifiable human need, such as food or warmth." *See Murithi*, 2016 WL 890695, at *9 (quoting *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006)); *see also Gray*, 826 F.3d at 1005 ("[S]ome conditions of confinement may establish an Eighth Amendment violation in combination when each alone would not do so.") (cleaned up).

Combining the conditions does not do enough to save Harris's claim. Even viewed collectively, the conditions were not so extreme that they violated constitutional standards. And Harris faced a major causation problem, too. He needed to present evidence that the conditions caused his eye disease. The record cannot support that conclusion.

Harris argues that all eight alleged conditions (inadequate cleaning supplies, stained clothing and bedding, unclean showers, mold in the showers, limited time outside, no open windows, dirty HVAC system, and paint fumes) had a snowball effect, and caused his eye disease.

Harris points to two pieces of evidence to show that the conditions collectively had a negative effect on his health. He relies on his declaration, which in turn refers to medical tests that aren't in the record. And he relies on his deposition, which included testimony about statements from his doctor that aren't in the record, either.

First, Harris points to his declaration, where he described his ongoing medical condition and challenges:

> My *medical tests* ruled out any non-environmental causes of my eye disease. Therefore, these filthy and unsanitary living conditions caused my eye condition and have exacerbated my panuveitis symptoms. My symptoms, which include blurred vision, light sensitivity, redness and swelling of my eyes, nausea, and eye pain, are very painful and extremely uncomfortable. I am still on medication to this day to help prevent my symptoms from re-flaring. However, my symptoms still periodically flare when I'm exposed to particularly bad conditions such as dirty indoor air or chemical fumes, and especially when I have not been outside for a long period of time.

*See* Harris Decl., at ¶ 16 (Dckt. No. 71-1) (emphasis added). Notice the reference to "medical tests," which aren't in the record.

Second, Harris points to his own testimony about what caused his eye disease. *See* Pl.'s Second Sur-Reply, at 12–13 (Dckt. No. 71). For the sake of completeness, here is the entire exchange:

> Q: How did you become aware that the mold, dirt, filth and paint chemicals caused inflammation of your eyes?
>
> A: Because my ophthalmologist said that it was – that those are highly – situations where those type of things could arise.
>
> Q: He didn't say that that was the cause.
>
> A. Basically she said that if I had – if I've been in constant contact with those three placed together, that, yeah – I mean, I guess they would have to get in here to do some testing, but she's like, yeah, you can pretty much bank on it.
>
> Q: Which three?
>
> A: The filth, mold, and the high octane chemicals.
>
>                \*      \*      \*
>
> Q: You say mold, dirt, filth and paint chemicals. How would you distinguish dirt from filth?
>
> A. Dirt is something that can be cleaned, I guess. Filth is something that's constant. Filth is – filth is the – the sheets and the blankets that they give to us. Filth is the – the mounds of how they – of how they supposed to sanitize our clothing but never do. I guess filth would be considered our showers, how they're never cleaned, period, and thousands of guys get in day-in, day-out, and they don't – it's constant mold up under the painting of the shower wall. There's mold directly under that paint. It's mold. Mounds of it. I mean, that's what I consider filth.

*See* Harris Dep., at 37:20–39:11 (Dckt. No. 52-5).

That evidence is not enough to create a genuine issue of material fact. The evidence is too thin to support the notion that the conditions of confinement caused his eye disease.

Notably, Harris's declaration and deposition both rely on hearsay. *See* Fed. R. Evid. 801. The declaration describes medical tests (*i.e.*, out-of-court statements) about the cause of his eye

condition. And his deposition testimony summarizes what his doctor told him (*i.e.*, another out-of-court statement) about the cause of his eye condition. Harris offers an out-of-court statement from his doctor about the cause of his disease, and does so for its truth. Harris wants to show that filth, mold, and paint really did cause his disease.

So, the declaration and the testimony rely on out-of-court statements to prove the cause of Harris's eye condition. That's a problem, because "[a] party may not rely on inadmissible hearsay to avoid summary judgment." *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011).

Harris argues that his testimony about his medical diagnosis falls under the hearsay exception for statements made for medical diagnosis or treatment. *See* Fed. R. Evid. 803(4). Harris is wrong. Rule 803(4) of the Federal Rules of Evidence does not apply.

Under Rule 803(4), "a hearsay statement is admissible if it 'is made for – and is reasonably pertinent to – medical diagnosis or treatment.'" *Lovelace v. McKenna*, 894 F.3d 845, 849 (7th Cir. 2018) (quoting Fed. R. Evid. 803(4)). "The Rule excepts statements made by a person seeking medical attention to the person providing that attention. Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996); *see also Martin v. Nicklow*, 499 F. App'x 569, 573 (7th Cir. 2013) (noting that the "exception applies only to statements made by the patient").

The statements in question do not fit within that exception. Harris is relying on what the doctor told *him*, not what Harris told the doctor.

The statements by the doctor do not satisfy the exception for records of a regularly conducted activity, either. *See* Fed. R. Evid. 803(6). Medical records presumably qualify as

24

records of a regularly conducted activity. *See, e.g.*, *Boyce v. Wexford Health Sources, Inc.*, 2017 WL 1436963, at *3 (N.D. Ill. 2017) ("Medical records are readily authenticated; they are, moreover, exceptions to the hearsay rule and generally admissible at trial.") (cleaned up).

But Harris only *describes* his medical records. He never *submits* his medical records, let alone lays the evidentiary foundation. Harris relies on a loose description of the medical records, without offering the records themselves. So the hearsay exception for records of a regularly conducted activity doesn't apply.

Harris had the opportunity to present admissible evidence about his medical condition from medical professionals, but he failed to do so. Testimony that evidence is out there – in unseen medical records, and unheard statements by a doctor – isn't going to cut it.

Summary judgment is the "put up or shut up" moment in a lawsuit. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). Here, Harris failed to come forward with admissible evidence that the conditions of confinement caused his medical condition.

In the end, Harris offers nothing except a belief that the unsanitary conditions and lack of air caused his disease. Maybe he's right. But that sort of claim requires evidence. And here, that evidence is missing.

A belief about the cause of a medical condition is not enough to get over the hump at the summary judgment stage and get to trial. *See Green v. Walker*, 398 F. App'x 166, 169 (7th Cir. 2010) ("But even if the ventilation system were inadequate, summary judgment was appropriate because Green presented only conclusory allegations that inadequate ventilation caused disease and respiratory problems."); *Walker v. Dart,* 2010 WL 3307079 at *6 (quoting *Dixon*, 114 F.3d at 645).

While panuveitis may qualify as a cognizable injury, Harris has not put forward more than "conclusory allegations" that the jail's inadequate sanitation and ventilation caused or worsened his disease. *See Green*, 398 F. App'x at 169. In other words, even under a "holistic view of the conditions," Harris has not shown a constitutional violation. *See Gray*, 826 F.3d at 1006.

The Court therefore grants the motion for summary judgment on Harris's conditions-of-confinement claim for lack of an underlying constitutional violation.

## II. Other Elements of a *Monell* Claim

Harris did not submit sufficient evidence of an underlying constitutional violation, which dooms his claim. Even so, his claim about the conditions of confinement fails for a second, independent reason. On this record, no reasonable jury could conclude that Harris has met the other requirements of *Monell*.

As explained above, Harris brings his conditions-of-confinement claim against Sheriff Dart in his official capacity and against Cook County. "Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or custom must have played a part in the violation of federal law.'" *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). So the claim must satisfy the requirements of *Monell*. *See Est. of Sims*, 506 F.3d at 514.

For a *Monell* claim to survive summary judgment, a plaintiff must come forward with evidence that "(1) she was deprived of a constitutional right; (2) the deprivation can be traced 'to some municipal action (*i.e.*, 'a policy or custom'), such that the challenged conduct is properly attributable to the municipality itself'; (3) 'the policy or custom demonstrates municipal fault, *i.e.*, deliberate indifference'; and (4) 'the municipal action was the moving force behind the

federal-rights violation.'" *See Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 524 (7th Cir. 2023); *Pulera v. Sarzant*, 966 F.3d 540, 550 (7th Cir. 2020). In short, *Monell* requires evidence of a constitutional violation, a policy or custom, culpability, and causation.

Sometimes the Seventh Circuit describes a *Monell* claim as having four elements. *See, e.g.*, *Thomas*, 74 F.4th at 524. And sometimes the Seventh Circuit mentions only three elements. *See*, *e.g.*, *Pulera*, 966 F.3d at 550.

In reality, there isn't a difference. Sometimes the Seventh Circuit includes the existence of a constitutional violation in the list of elements for a *Monell* claim, and sometimes it doesn't. But the omission doesn't signal anything, from a substantive perspective. A constitutional violation is always necessary – it's the *sine qua non* of a *Monell* claim. Sometimes it goes without saying that a *Monell* claim requires a constitutional violation.

As any intrepid reader who has made it this far undoubtedly knows, this Court already established that Harris did not come forward with evidence of a constitutional violation. This Court could stop now. But instead, this Court will walk through the remaining elements, in the interest of completeness. The bottom line is that Harris has not come forward with enough evidence to get to a jury on the remaining parts of *Monell*.

### A. Municipal Action.

After establishing a constitutional violation, the next hurdle is tying the violation to the municipality itself. A municipality has liability only for the municipality's own conduct.

To establish the link, a plaintiff must offer evidence of a policy, a widespread practice, or an action by a policymaker. "Three types of municipal action support *Monell* liability: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation

that the constitutional injury was caused by a person with final policymaking authority.'" *Thomas*, 74 F.4th at 524 (citation omitted).

Here, Harris contends that the jail had an express policy, and a widespread custom, of depriving inmates of adequate conditions of confinement. But he blurs those theories together. He seems to be arguing that the jail had both policies and practices that caused the constitutional violations, without distinguishing the two types of claims. *See, e.g.*, Pl.'s Second Sur-Reply, at 6 (Dckt. No. 71) ("It was the Defendants' policy and practice to rely on detainees to clean their housing tiers, without any professional supervision or inspection, and without providing the training, supervision, or supplies necessary to effectuate that task.").

For the sake of clarity, this Court will separate them. The Court will address the claim about an express policy, and then the claim about a widespread practice.

### 1. Express Policy.

The first question is whether Harris came forward with evidence of an unconstitutional policy. Harris argues that the jail's cleaning, laundering, and recreation policies created the unconstitutional conditions.

A plaintiff can bring two types of express policy claims. The first type requires the plaintiff to "identify specific language in the policy that explicitly violates a person's constitutional rights." *See Alcorn v. City of Chicago*, 2018 WL 3614010, at *15 (N.D. Ill. 2018) (citing *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005)). The second type applies where a facially constitutional policy "fails to address certain issues." *Id.* That is, municipal liability can be premised on "a gap in express[] policies." *Bohanon v. City of Indianapolis*, 46 F.4th 669, 676 (7th Cir. 2022) (alteration in original) (quoting *Daniel v. Cook Cnty.*, 833 F.3d 728, 734 (7th Cir. 2016)). Both types of claims require the plaintiff to point to an express municipal policy.

28

Harris has pointed to an express policy about cleaning supplies. The jail has a policy of providing cleaning supplies, and requiring inmates to clean their living quarters. The jail provides detainees with a mop, bucket, brooms, scrub brushes, and liquid cleaner. *See* Pl.'s Second Sur-Reply, at 8 (Dckt. No. 71) (citing Delitz Dep., at 19:13-22 (Dckt. No. 71-3)).

There is nothing unconstitutional about a jail relying on detainees to clean their own living quarters. The Constitution does not require jails to hire professional cleaners. *See Gonzalez v. Josephson*, 2019 WL 1013737, at *12 (N.D. Ill. 2019) ("[T]he Constitution does not mandate comfortable prisons.") (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)); *see also Woods v. Cook Cnty. Jail*, 2018 WL 10807914, at *3 (N.D. Ill. 2018) ("While Plaintiff is dissatisfied with the level of cleanliness in her housing units, 'there is . . . a de minimis level of imposition with which the Constitution is not concerned.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

Harris points to a lack of training. *See* Pl.'s First Sur-Reply, at 5 (Dckt. No. 65). But it is unlikely that detainees need training in how to use brooms and mops. Harris does not offer evidence that he was stumped about how to use the scrub brushes or the liquid cleaner. They're self-explanatory. And in any event, failing to give training on how to clean does not violate minimal standards for civilization. *See Johnson*, 2020 WL 5891405, at *2.

The jail also has a policy of giving each tier two 32-ounce spray bottles of liquid cleaner per day. *See* Harris Decl., at ¶ 7 (Dckt. No. 71-1). That amount of cleaning supplies unquestionably clears the constitutional minimum. *See Murithi*, 2016 WL 890695, at *7; *Sanchez*, 2010 WL 5313815, at *10; *Gurley v. Sheahan*, 2009 WL 2178685, at *8.

29

For other parts of the claim, Harris does not appear to identify any particular policy. For example, there is no discernible policy about the cleanliness of the shower (including mold, and food clogged in the drains), or about the cleanliness of ventilation ducts.

The rest of the claim is about dirty laundry (including how often the clothes are washed), recreation time, and ventilation, and so on. For the reasons explained above, no reasonable jury could conclude that the jail's policies violated constitutional standards.

The other option for an express-policy claim is an as-applied challenge. Harris contends that the jail's cleaning policy caused unconstitutional conditions as applied to him. "This type of claim presents 'difficult problems of proof.'" *See Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 236 (7th Cir. 2021) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 406 (1997)). And here, Harris has not presented evidence that he (or anyone else, for that matter) suffered a constitution violation as a result of a policy.

Viewing the record as a whole, Harris has failed to come forward with sufficient evidence that the jail had an express policy that led to a constitutional violation.

### 2. Widespread Practice

A plaintiff also can establish municipal action by offering evidence of a widespread practice. (There is a third route, too, when a policymaker made the decision in question. But that's not this case.)

To establish a widespread practice, a plaintiff must demonstrate that the unwritten practice "is so well entrenched and well-known as to carry the force of policy." *Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 826 (7th Cir. 2022). "Providing boilerplate allegations of a municipal policy, or pointing to a few isolated incidents of official action will not suffice to show the existence of such a practice." *Id.* (cleaned up).

The Seventh Circuit has not adopted any bright-line rules defining "custom or practice," but it has found that "it must be more than one instance." *See Thomas*, 604 F.3d at 303 (quoting *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988)). That said, "a practice may not be widespread if it took place two, three, or four other times." *See Black v. City of Chicago*, 2022 WL 425586, at *5 (N.D. Ill. 2022) (collecting cases).

Harris contends that the jail had widespread and persistent practices that caused the violations. He relies on three practices or customs that mirror the policies above: (1) relying on detainees to clean their own tiers with inadequate cleaning supplies; (2) redistributing dirty clothing and laundry; and (3) giving inmates insufficient outdoor recreation time.[4] *See* Pl.'s Second Sur-Reply, at 11–14 (Dckt. No. 71).

Harris begins by targeting the jail's cleaning practices (which he also characterizes as a policy). He says that the jail relies on detainees "to clean their housing tiers, without any professional supervision or inspection, and without providing the training, supervision, or supplies necessary to effectuate that task." *Id.* at 6. According to Harris, this practice/policy results in unconstitutional filth throughout the tiers.

Harris offers evidence about his personal experience, including his living conditions. But Harris does not offer much evidence about the conditions of confinement of other detainees. He doesn't offer much evidence about the cleanliness of their cells, for example.

True, they're all living under the same roof. And the practices do seem to sweep broadly. All of the detainees on his tier get the same access to the same cleaning supplies. They all wear the same clothing that is washed the same way, and so on.

---

[4] Harris never argues that he was exposed to paint fumes based on an express policy or widespread practice. Indeed, Harris alleges only that he was exposed to paint fumes for one day. *See* Pl.'s Second Sur-Reply, at 7–8 (Dckt. No. 71). Without any evidence linking his paint exposure to an express policy or widespread practice, any *Monell* claim based on the paint fumes cannot survive summary judgment.

Even so, the similarity with other detainees doesn't help Harris. Harris did not experience a constitutional violation, so the other detainees didn't experience a constitutional violation, either.

**B.     Municipal Fault, and Causation**

The claim fails to satisfy the other elements of a *Monell* claim, too. Harris has not come forward with sufficient evidence of municipal fault (that is, deliberate indifference), or moving-force causation.

Evidence about deliberate indifference is missing. The record does not permit the inference that the jail consciously disregarded a known or obvious risk that its policies or practices would violate constitutional rights. *See Dean*, 18 F.4th at 239; *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 599 (7th Cir. 2019).

For example, Harris alleges that the jail did not provide adequate cleaning supplies. But there is no evidence that the jail acted "purposefully, knowingly, or perhaps even recklessly" when it supplied the mops, the brooms, and other supplies. *See Miranda v. County of Lake*, 900 F.3d 335, 353 (7th Cir. 2018). Similarly, there is no evidence that the jail acted with deliberate indifference when the detainees received clothing that had stains. And so on.

Causation is problematic, too, especially for the claim about general cleanliness. A plaintiff must satisfy *Monell*'s "rigorous causation standard," which requires "a 'direct causal link' between the challenged municipal action and the violation of [the plaintiff's] constitutional rights." *See Dean*, 18 F.4th at 236 (quoting *Est. of LaPorta*, 988 F.3d at 987). "The central question under *Monell* is always whether an official policy, however expressed, caused the constitutional deprivation." *See Turner v. Paul*, 953 F.3d 1011, 1016 (7th Cir. 2020) (cleaned up); *see also Brown*, 520 U.S. at 404 ("[I]t is not enough for a § 1983 plaintiff merely to identify

32

conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.") (emphasis in original); *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 306 (7th Cir. 2009) (noting that "the premise behind a § 1983 action against a government body is 'the allegation that official policy is *responsible* for the deprivation of rights'") (emphasis in original) (quoting *Monell*, 436 U.S. at 690).

For example, Harris must show that the cleaning policy itself – "not simply the actions of the employees administering it" – directly caused his conditional deprivation. *See Dean*, 18 F.4th at 239. He can do so by pointing to similar problems for other inmates. *Id.* at 239–40.

But once again, Harris fails to show that other detainees experienced similar deprivations based on the cleaning policy. He would need to present evidence that the policy itself caused the uncleanliness – and not, for example, a failure of the other inmates to use the cleaning supplies. Here, Harris does not offer evidence that other inmates experienced unclean conditions, and that they did so because of a lack of supplies (instead of a failure to use them).

What's more, the housing tier was dirty according to Harris's preferred level of cleanliness. But the case does not involves conditions that were so vile that they create an inference of an impact on other inmates. *Cf. Fuller v. Dart*, 2022 WL 971998, at *5 (N.D. Ill. 2022) ("[I]t is reasonable to assume that worm and maggot infestations and contaminated water would affect the other inmates housed near Fuller."); *Brown v. Dart*, 2017 WL 3219217, at *5 (N.D. Ill. 2017) ("A pest infestation extending from Plaintiff's cell through 'the living quarters and . . . in the cells and dayroom' is also unlikely to affect Plaintiff in isolation.").

Harris responds in a footnote. He argues that he "reserves the right to call at trial other pretrial detainees" to "testify to the lack of access to outside air and the conditions of

confinement." *See* Pl.'s Second Sur-Reply, at 5 n.1 (Dckt. No. 71); *see also id.* at 6 n.2 ("Any of the other detainees who resided on a tier with Mr. Harris could be called at trial to corroborate Mr. Harris' testimony and to testify to the conditions of confinement."). He specifically names three pretrial detainees who he disclosed in an interrogatory answer. *Id.* at 5 n.1. The interrogatory answer simply says that there are three inmates "with knowledge regarding the allegations" in Harris's complaint. *See* Pl.'s Resp. to Defs.' First Set of Interrogatories, at ¶ 5 (Dckt. No. 65-3). Harris does not point to any testimony by these individuals. Instead, he remarks that "Defendants chose not to depose these potential witnesses." *See* Pl.'s Second Sur-Reply, at 5 n.1, 6 n.2 (Dckt. No. 71).

Again, summary judgment is the "put up or shut up" moment in a lawsuit. *See Grant*, 870 F.3d at 568. A non-moving party can survive summary judgment only by "identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Id.*

Harris had the opportunity to depose his proposed three witnesses, but he chose not to. He cannot now shift the blame to Defendants. *See Lovi v. Village of Arlington Heights*, 62 F. Supp. 3d 756, 770 (N.D. Ill. 2014) ("To the extent the record lacks information about these visits, plaintiff chides defendants for failing to depose the doctor. At this stage of the litigation, though, it is plaintiff's burden to present evidence of his claim . . . .") (citation omitted).

Pointing to potential witnesses, after discovery has closed, cannot function as a get-out-of-summary-judgment free card. And Harris's response appears particularly misplaced given both parties' lackadaisical pace during discovery. *See, e.g.*, 5/20/21 Order (Dckt. No. 51) ("[T]he docket in this case shows the none of the parties have pressed this case forward with any sense of urgency.").

Moreover, while the nonmovant "need not depose his own witnesses or produce evidence in a form that would be admissible at trial," the nonmovant must still "demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in his favor." *See Burton v. Kohn L. Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019). "A party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Id.* (cleaned up).

The fact that witnesses might know something is not enough. That's not evidence of similar experiences, let alone evidence of cognizable harms. And any general inference of what the witnesses *could* say is simply too vague to oppose summary judgment. *See Cote v. MTP, Inc.*, 2003 WL 1477853, at *2 (N.D. Ill. 2003) ("[I]t is too late to say what evidence she may be able to develop in the future. If Cote truly needed more time to depose her expert, she should have moved to stay the briefing on the pending motion for summary judgment.").

The same issues plague the rest of his claim about the other conditions. Harris does not offer evidence that a policy or practice of the jail was the moving force behind the presence of food in the drains, or mold in the shower. And so on. Evidence of moving-force causation simply isn't there.

To sum it all up, Harris has not come forward with sufficient evidence to satisfy *Monell*. He has not presented evidence of an express policy or a widespread practice that violated constitutional standards. The record lacks evidence of deliberate indifference, and it lacks evidence of causation, too.

*     *     *

One final note. Harris contracted an eye disease called panuveitis while incarcerated. That's no small thing. In fact, it's a potentially big thing. The condition could threaten his eyesight if not properly treated.

The issue here is not whether Harris's condition should be taken seriously. And the issue is not whether Harris is living in conditions that would satisfy most people. The question is simply whether the evidence is enough to create an issue of fact about a constitutional violation, and whether that evidence can lead to municipal liability. On this record, the Court concludes that it does not. But nothing in that ruling downplays the seriousness of his eye condition, or the importance of receiving proper medical treatment.

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment on Harris's conditions-of-confinement claim is granted. In light of this Court's earlier ruling on the motion for summary judgment, plus the ruling at hand, the Court grants summary judgment to Defendants on all claims.

Date: April 19, 2024

_____

Steven C. Seeger
United States District Judge